## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 2023-cr-0016** |
| | ) | |
| **ENOCK COLE and JIOVONI SMITH,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**Attorneys:**
**Rhonda Williams-Henry, Esq.**
St. Croix, U.S.V.I.
**Denise George, Esq.**
St. Thomas, U.S.V.I.
  *For the United States*

**Raul E. Bandas, Esq.**
**Jessica Earl, Esq.**
**Celso Perez, Esq.**
San Juan, P.R.
**Gary Proctor, Esq.**
Baltimore, MD
  *For Defendant Cole*

**Juan F. Matos-de Juan, Esq.**
San Juan, P.R.
**Teri L. Thompson, Esq.**
Snellville, GA
  *For Defendant Smith*

## <u>MEMORANDUM OPINION AND ORDER</u>

**Lewis, Senior District Judge**

  THIS MATTER comes before the Court on the trial in this matter scheduled for September 8, 2025; the Government's "Notice of Intent to Seek the Death Penalty" for Defendant Enock Cole and Defendant Jiovoni Smith ("Seek Notices") (Dkt. Nos. 175, 176); the Government's "Amended Notice of Response to July 11, 2025[] Order" ("Seek Notice Memorandum") (Dkt. No. 180); Defendants Enock Cole and Jiovoni Smith's ("Defendants")

"Response to Notice of Intent to Seek the Death Penalty and Motion to Strike" ("Motion to Strike") (Dkt. No. 186); and the Government's "Reply to Response to Notice of Intent to Seek the Death Penalty and Motion to Strike" ("Reply") (Dkt. No. 199).

The Court approaches this issue cognizant of the Supreme Court's admonishment—tracing back over 200 years—that "in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner." *Illinois v. Somerville*, 410 U.S. 458, 461 (1973) (quoting *United States v. Perez*, 9 Wheat. 579, 580 (1824)).  With this cautionary expression in mind and for the reasons discussed below, the Court will strike the Government's Notices of Intent to Seek the Death Penalty, and the trial on September 8, 2025 will proceed as a non-capital trial.

## I.     BACKGROUND

Defendants were charged by Information in November 2023 with seven counts related to a robbery and homicide that occurred at Castaways of St. Croix, a bar and restaurant, on November 14, 2018 on St. Croix, Virgin Islands.  (Dkt. No 1).  A subsequent Indictment filed in January 2024 (Dkt. No. 8) charged Defendants with, *inter alia*, use of a firearm during a crime of violence resulting in death, pursuant to 18 U.S.C. § 924(j)(1), which is a capital-eligible offense.  18 U.S.C. § 924(j)(1) ("A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall . . . if the killing is a murder . . . be punished by death or by imprisonment for any term of years or for life.").

On February 7, 2024, at the Government's request, Magistrate Judge Emile A. Henderson III extended the Government's deadline to "serve its Notice concerning whether the United States intends to seek the death penalty in this matter" (the "Section 3593 Notice Deadline") from March 5 to March 7, 2024.  (Dkt. No. 37 at 2).  On February 16, 2024, Defendant Smith moved

for the appointment of learned counsel in a capital case (Dkt. No. 42), and on February 20, 2024, Magistrate Judge Henderson appointed learned counsel for Defendant Smith (Dkt. No. 43).  On March 1, 2024, the Government then filed a "Non-Capital Notice" ("No-Seek Notice"), informing the Court and Defendants that it did not intend to seek the death penalty for either Defendant. (Dkt. No. 44).  Accordingly, on March 4, 2024, Magistrate Judge Henderson terminated the appointment of learned counsel for Defendant Smith.  (Dkt. No. 45).[1]  An automated trial date of March 18, 2024 generated at Defendant Smith's Initial Appearance on February 1, 2024 was subsequently continued several times, at the request of either Defendants or the Government, due to scheduling conflicts and for resolution of evidentiary issues.  (Dkt. Nos. 47, 62, 71, 80, 86, 129).

The most recent continuance was sought on March 20, 2025, when the Government represented that it needed "additional time to secure and prep witnesses for trial who are currently off island." (Dkt. No. 122 at 1).  Defendants did not oppose the continuance.  *Id.*  Magistrate Judge Henderson held an informal conference on March 20, 2025, at which the parties agreed to a trial date of September 8, 2025 based on the Court's calendar.[2]

On March 26, 2025, the Government filed a request to stay all proceedings in the case for 120 days "in order to permit the Attorney General's Capital Review Committee to review the no-seek decision" that had been filed on March 1, 2024.  (Dkt. No. 125 at 2).[3]  The Government

---

[1] Learned counsel for Defendant Cole had not yet been appointed.

[2] The Government had requested to move the trial then scheduled to commence on May 5, 2025 to "the third or fourth week of June."  (Dkt. Nos. 122 at 1, 129 at 1).

[3] On March 19, 2025, the Department of Justice's Capital Case Section ("DOJ-CCS") had advised the Criminal Chief for the U.S. Attorney's Office for the District of the Virgin Islands ("USAO-DVI") by email that the instant case "ha[d] been selected for further evaluation" pursuant to the Attorney General's February 5, 2025 Memorandum titled "Reviving the Death Penalty and Lifting the Moratorium on Federal Executions."  (Dkt. No. 186-6 at 6).  The DOJ-CCS representative requested that the prosecution team "take whatever steps are necessary to postpone case determinative actions . . . until this fuller review is completed."  *Id.*  On March 26, 2025, the USAO-DVI Criminal Chief responded to the DOJ-CCS representative, acknowledging the request

represented that "all Department decisions to refrain from seeking the death penalty in death-eligible cases since January 20, 2021" were undergoing review. *Id.* at 1-2.

On March 27, 2025, Magistrate Judge Henderson entered an Order setting the new trial date of September 8, 2025 based upon the agreement reached at the informal conference on March 20, 2025. (Dkt. No. 129 at 1). Further, on April 2, 2025, Magistrate Judge Henderson entered an Order denying the Government's motion for a stay because the Court was "not prepared to stay any remaining discovery and other possible motions while the Government once again makes up its mind as to whether to seek the death penalty in this case." (Dkt. No. 133 at 5-6). In the Order, the Magistrate Judge noted that counsel for Defendants did not oppose the Government's request for a continuance of the trial that was filed days prior to the Government's request for a stay of all proceedings because they believed the reasons set forth by the Government were offered in good faith, and did not believe that they were exposing their clients to the risk of capital punishment by not opposing the requested continuance. *Id.* at 3. Defendant Smith and Defendant Cole filed motions on April 11, 2025 and April 14, 2025, respectively, seeking the appointment of learned counsel (Dkt. Nos. 135, 137), and on April 21, 2025 Magistrate Judge Henderson appointed learned counsel for Defendants. (Dkt. Nos. 139, 140).

At a status conference on June 27, 2025 before Magistrate Judge Henderson, counsel for Defendants represented that they had a meeting with the Capital Review Committee on June 25, 2025. However, counsel for the Government was unable to make any representation regarding when a decision would be made by the Government on the death penalty issue—leaving open the possibility for the decision to be made as late as the day of the start of trial on September 8, 2025.

---

to postpone case determinative actions and indicating that the USAO-DVI would file such a motion in the instant case on that day. *Id.* at 5. An Assistant U.S. Attorney responsible for this case was copied on this reply, and the request for a stay was filed the same day. *Id.*

That degree of uncertainty by the Government at this late stage of the proceedings prompted the Court to issue a Memorandum Opinion and Order on July 11, 2025, in which the Court set a deadline for the Government to submit a filing stating its position on the death penalty, together with a schedule for additional, relevant briefing if the Government expressed an intent to reverse the prior No-Seek Notice and pursue the death penalty against either or both Defendants. *United States v. Cole*, 2025 WL 1918001 (D.V.I. July 11, 2025) (Dkt. No. 172). The relevant briefing required the Government to state its position on the following:

> (1) Whether the Government's Section 3593 Notice is timely as it relates to the March 7, 2024 deadline set by the Magistrate Judge;
>
> (2) Whether the Section 3593 Notice fulfills all requirements under 18 U.S.C. § 3593, including service within "a reasonable time before the trial";
>
> (3) Whether the Government is legally empowered to reverse a "No-Seek Notice" to a "Seek Notice"; and
>
> (4) Whether the reversal of the "No-Seek Notice" to a "Seek Notice" in this case would be justified under the circumstances here, given the proximity to trial and the time period during which the case proceeded under the No-Seek Notice[.]

*Id.* at *4. The July 11, 2025 Memorandum Opinion and Order emphasized that the Court made "no decision regarding any substantive issues," including but not limited to "whether a Section 3593 Notice made at this point in the case would be timely, legally permissible following a No-Seek Notice, or within 'a reasonable time before the trial' as required under 18 U.S.C. § 3953(a)." *Id.*

On July 18, 2025, in accordance with the deadline set by the Court's July 11, 2025 Order, the Government filed Seek Notices for Defendants. (Dkt. Nos. 175, 176). The Seek Notice for Defendant Cole states that Defendant Cole was above the age of 18 at the time of the offense; set forth the four requisite intent factors under 18 U.S.C. § 3591; and included one statutory

aggravating factor as well as two non-statutory aggravating factors under 18 U.S.C. § 3592(c).[4] (Dkt. No. 175).  The Seek Notice for Defendant Smith contained identical statements regarding age and requisite intent, and included two statutory aggravating factors and one non-statutory aggravating factor under 18 U.S.C. § 3592(c).[5]  (Dkt. No. 176).  On the same day, the Government also filed its "Response to July 1[1], 202[5][] Order" (Dkt. No. 177), addressing the four above-referenced issues set forth in the Court's Order.[6]

On July 25, 2025, in support of their Motion to Strike, Defendants filed a 177-page document styled as an "Unopposed Motion to File Overlength Response," with a 69-page response and Motion to Strike included as attachments, together with several declarations and an email chain.  (Dkt. No. 184).  On July 28, 2025, the Court granted the Motion to File an Overlength Response (Dkt. No.185), and Defendants refiled the document as the instant Motion to Strike (Dkt. No. 186).  The Government filed its "Reply to Response to Notice of Intent to Seek the Death Penalty and Motion to Strike" ("Reply") (Dkt. No. 199) on August 1, 2025.

---

[4] The statutory aggravating factor alleges that Defendant Cole "knowingly created a grave risk of death to one or more persons in addition to the victim of the offense" per 18 U.S.C. § 3592(c)(5)). (Dkt. No. 175 at 2).  The two non-statutory aggravating factors are: (1) that Defendant Cole "was on pretrial release from a murder charge at the time he committed the [instant] crime . . . and was later convicted of second-degree murder in relation to that charge"; and (2) that Defendant Cole killed the victim "in an attempt to obstruct justice by eliminating a witness to the robbery."  *Id.*

[5] The two statutory aggravating factors allege that Defendant Smith: (1) in common with Defendant Cole's Notice, "knowingly created a grave risk of death" to additional individuals, and (2) has a prior conviction for which he is serving a term of imprisonment greater than a year "involving the use or attempted or threatened use of a firearm against another person"—namely, that Defendant Smith "was convicted of second-degree murder for shooting and killing a woman in 2020."  (Dkt. No. 176 at 2).  The non-statutory aggravating factor—in common with Defendant Cole's Notice—is that Defendant Smith killed the victim "in an attempt to obstruct justice by eliminating a witness."  *Id.*

[6] On July 22, 2025, the Government filed an amended response—correcting certain typographical errors in its filing, but with no substantive changes.  (Dkt. No. 180).  The amended filing constitutes the Government's Seek Memorandum.

On August 18, 2025, the parties filed a joint motion in which they requested that the Court determine the death penalty issue based upon the pleadings—thereby withdrawing Defendants' request for oral argument (Dkt. No. 197 at 1-2)—and moved for the issuance of an order containing the Court's determination as soon as possible, even if a memorandum opinion explaining the bases for the decision follows later.  (Dkt. Nos. 229 at 2).  The parties represented that they were in agreement that an "expeditious ruling" on the death penalty issue would be "beneficial" to all parties.  *Id.*  On the same day, in light of this decision's impact on the processes and procedures to be followed at the fast-approaching trial on September 8, 2025, the Court took the rare step of apprising the parties of the Court's intended ruling to strike the Government's Notices of Intent, and order that the trial scheduled to commence on September 8, 2025 proceed as a non-capital trial.  (Dkt. No. 230 at 2).  The instant Memorandum Opinion and Order embodies the Court's ruling.

## II.    APPLICABLE LEGAL PRINCIPLES

### A.    Court Deadlines

District courts have "the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases."  *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016); *see also United States v. Santos Diaz*, 66 F.4th 435, 443-44 (3d Cir. 2023), *cert. denied,* 144 S. Ct. 203 (2023) ("Federal courts have certain powers that are not created by statute yet are necessary by virtue of having to manage their dockets and ensuring cases are disposed of properly. . . . Relatedly, it is well established that 'a trial judge indisputably has broad powers to ensure the orderly and expeditious progress of trial.'") (citation modified); *Drippe v. Tobelinski*, 604 F.3d 778, 783 (3d Cir. 2010) ("As a general matter, we accord district courts great deference with regard to matters of case management.").

This inherent power "extends to setting and enforcing deadlines, including a deadline for filing a Section 3593 notice" or requiring "[a] notice to be filed by the government in the event it elects not to seek the death penalty." *Cole*, 2025 WL 1918001 at *3 (collecting cases); *see also United States v. Spurlock*, 782 F.Supp.3d 987, 1002 (D. Nev. May 9, 2025), *appeal dismissed*, 2025 WL 2319947 (9th Cir. June 11, 2025) ("Setting a death-notice deadline is standard practice for good reason: the deadline is integral to the court's ability to manage its docket and to determine other pretrial matters without protracted uncertainty, as well as to ensure that defendants' rights are protected."); *United States v. Slone*, 969 F.Supp.2d 830, 838 n.5 (E.D. Ky. 2013) ("[J]udges are not beholden to the DOJ's sluggish pace [in making a determination regarding its intent to seek the death penalty].").  A deadline set by a court is a binding order of the Court.  *Darrah v. Virgin Islands ex rel. Juan F. Luis Hosp.*, 2011 WL 6181352 at *4 (D.V.I. Dec. 13, 2011) ("It is important to correct counsel's mistaken belief regarding the optional nature of deadlines contained in scheduling orders.").  Litigants and their counsel are "not at liberty to ignore court orders at their discretion and, if they choose to do so, they act at their own peril." *Id.*; *see also Rivera-Aponte v. Gomez Bus Line, Inc.*, 62 F.4th 1, 7 (1st Cir. 2023) ("Given the amply stocked armamentarium that is available to a district court to combat the flouting of court-ordered deadlines, 'a litigant who ignores a case-management deadline does so at his peril.'"); *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1030 (7th Cir. 1998) ("[A] good judge sets deadlines, and the judge has a right to assume that deadlines will be honored."); *United States v. Tsarnaev*, 2013 WL 5701582 at *2 (D. Mass. Oct. 18, 2013) ("Setting of timelines for court events [such as a Section 3593 Notice] may, in some circumstances, compel a party to adjust its own timelines so as to be in compliance with the court's dates[.]").

When faced with a failure to comply with Section 3593 Notice deadlines, some courts have denied the validity of the untimely Section 3593 Notice, by striking the untimely notice; deeming the Government's right to seek capital punishment to be waived; or denying an extension of a Section 3593 Notice deadline. *See, e.g.*, *Spurlock*, 782 F.Supp.3d at 1009 (striking a Section 3593 Notice because "the Court has the authority to set and enforce a reasonable death notice deadline and will hold the government to the deadline it consented to"); *United States v. Gomez-Olmeda*, 296 F.Supp.2d 71, 86 (D.P.R. 2003) (striking an untimely Section 3593 Notice under the Court's local rules which require filing of such Notice within 180 days and in which the Government did not seek to extend the deadline); *United States v. Ball* ("*Ball I*"), 2006 WL 8570266 at *1 (D.D.C. Oct. 19, 2006) (holding that the government "waived its right to seek capital punishment" "after the government [] failed to file any notice of intent to seek the death penalty by the [] deadline that [the Court] imposed five months earlier"); *United States v. Yandell*, 2023 WL 12087482 at *5 (E.D. Cal. Oct. 18, 2023) (denying the extension of a Section 3593 notice where "the government does not explain why it could not comply with the court's order[,] [n]or has it justified its request for an extension filed on the date notice was due, especially in the face of a rapidly approaching trial date.").

**B.    Section 3593 Statutory Procedures and Notice**

The Federal Death Penalty Act ("FDPA") bifurcates a capital trial into two phases—the guilt phase and the penalty phase.  18 U.S.C. § 3593(b).  If there is a guilty verdict and the case proceeds to the penalty phase, the jury must first determine whether a defendant is eligible for the death penalty.  *United States v. Savage*, 2013 WL 1934531 at *5 (E.D. Pa. May 10, 2013).  To do so, the Government must prove beyond a reasonable doubt: (1) that the defendant is at least eighteen years of age; (2) that the defendant acted with the requisite intent; and (3) that at least one

"statutory aggravating factor" exists.  *Id.*; *see also United States v. Williams*, 2013 WL 1335599 at *23 (M.D. Pa. Mar. 29, 2013) ("[T]he jury must find that the defendant acted with the requisite "intent" pursuant to 18 U.S.C. § 3591(a)(2) and that the Government proved the existence of at least one statutory aggravating factor beyond a reasonable doubt.").  If the jury finds that the defendant is eligible, the same jury must consider in a separate hearing "whether the death penalty should be imposed after balancing all of the statutory and non-statutory aggravating factors and the mitigating factors."  *Savage*, 2013 WL 1934531 at *5.  The jury's determination regarding the imposition of either the death penalty or a sentence of life imprisonment must be unanimous.  *Id.*[7]

If the Government believes that a sentence of death is justified by the circumstances of the offense, and intends to seek the death penalty for a defendant, it must "file with the court, and serve on the defendant" a notice of such intent.  18 U.S.C. § 3593(a); *see also Spurlock*, 782 F.Supp.3d at 1003 ("Because the death penalty implicates unique procedural and constitutional requirements, including a separate penalty trial phase, the government's decision to pursue capital punishment triggers resource-intensive processes in practically every arena of trial preparation – from appointment of counsel to motion practice to jury selection to qualification of experts.").  This notice—interchangeably referred to as a "Seek Notice," a "Death Notice," or a "Section 3593 Notice"—must: (1) state "that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the government will seek the sentence of death"; (2) set forth "the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death"; and (3) be filed with the Court and served on the defendant "a reasonable time before the trial or before acceptance

_____

[7] A defendant has the option to have the penalty decided by a judge rather than a jury "upon the motion of the defendant and with the approval of the attorney for the government."  18 U.S.C. § 3593(b)(3).

by the court of a plea of guilty." 18 U.S.C. § 3593(a); *see also Savage*, 2013 WL 1934531 at *5-6 (discussing the substantive requirements of the notice); *Williams*, 2013 WL 1335599 at *23-24 (identifying the timing and substantive requirements of the notice). Notice is thus critical for both the defendant and the Court—the defendant must prepare to be tried for his or her life, and the Court must seamlessly accommodate the additional procedural requirements of a capital trial.

Two federal appellate courts have established complementary standards for evaluating the reasonableness of a Section 3593 Notice for purposes of assessing timeliness. *United States v. Ferebe* holds that reasonableness requires an "objective inquiry" that involves consideration of a non-exhaustive list of factors, including: "(1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and, in addition, (4) the status of discovery in the proceedings." 332 F.3d 722, 737 (4th Cir. 2003) (noting that "consideration of still other factors is not foreclosed"). *United States v. Wilk* mandates an "objective reasonableness" test, which considers the "totality of the circumstances," including: "(1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known." 452 F.3d 1208, 1121 & n.23 (11th Cir. 2006) (noting that "[o]ur conclusion that evaluating objective reasonableness requires an unrestricted evaluation of all the circumstances is thus not inconsistent with the Fourth Circuit's approach [in *Ferebe*]").

As noted above, *Ferebe* mandates that the "proper analysis of a motion to strike a Death Notice for violation of section 3593(a)'s timeliness requirement must clearly address [] the period

of time that remains before trial, as of the moment of the Death Notice's filing, and irrespective of that filing." 332 F.3d at 737. Thus, Courts that follow *Ferebe* have found that "if a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable." *United States v. Ponder*, 347 F.Supp.2d 256, 267 (E.D. Va. 2004); *see also United States v. Le* ("*Le I*"), 311 F.Supp.2d 527, 532 (E.D. Va. 2004) ("Put another way, an untimely Death Notice cannot be rescued by delaying the trial date."); *United States v. Hatten*, 276 F.Supp.2d 574, 579 n.4 (S.D. W. Va. 2003) ("[D]elaying the trial date is not a remedy for an untimely Death Notice."); *United States v. Breeden*, 2003 WL 22019060 at *2 (W.D. Va. Aug. 22, 2003), *aff'd*, 366 F.3d 369 (4th Cir. 2004) ("[A] court cannot continue a case for the purpose of allowing the government to file a timely Death Notice."). *Ferebe*'s holding is rooted in an understanding that Section 3593(a) created a *prophylactic* right for a capital defendant to reasonable notice before trial that cannot be violated—rather than a *remedial* right that can be cured by a continuance. *See* 332 F.3d at 727 ("The right requires, *as a prophylactic,* reasonable notice *before trial.* And its indisputable purpose is to ensure that the accused will not be required to stand trial for his life without having received adequate notice before that trial that he *is* to stand trial for [a] capital offense (in addition to ensuring that an accused will not receive the death penalty without having received such notice)." (emphasis in original)).

By contrast, *Wilk* holds that "[w]here a district court determines that the Death Notice was filed at a time when either party, particularly the defense, would reasonably be unprepared for a capital trial on the previously scheduled trial date, a continuance of the trial is appropriate." 452 F.3d at 1223. In so holding, *Wilk* established that a district court may continue a trial date "after a Death Notice is filed in order to make sure defense counsel has adequate preparation time for a now-required death defense" even if "in the process it cures what might have otherwise been an

untimely Death Notice." *Id.* at 1224. Some courts have chosen to follow this approach. *See United States v. Williams*, 318 F. App'x 571, 572 (9th Cir. 2009) ("We agree with the [reasoning in *Wilk*] which held that in assessing reasonableness, a court is not limited to the interval between the time the notice was filed and the trial date at the time of that filing, irrespective of any trial continuances."); *United States v. McGriff*, 427 F.Supp.2d 253, 272 (E.D.N.Y. 2006) ("Balancing the competing interests, the Court concludes that they do not warrant striking the death notice, thus leaving a continuance as the proper remedy for the untimely notice.").

### C.    Amendment of a Section 3593 Notice

Under the FDPA, a "court may permit the attorney for the government to amend the notice upon a showing of good cause."  18 U.S.C. § 3593(a).  A sister district court within the Third Circuit has interpreted "good cause" in this context to exist "whenever the government can demonstrate that there was no deliberate delay by the government and no prejudice to the defendant." *United States v. Cooya*, 2012 WL 2321572 at *2 (M.D. Pa. June 19, 2012).  The Eleventh Circuit adopted a similar three factor test to evaluate good cause under the FDPA "where (1) new factors have plausible connection to facts, (2) [there is] no deliberate delay by [the] Government, and (3) [there is] no prejudice to defendant." *United States v. Battle*, 173 F.3d 1343, 1347-48 (11th Cir. 1999); *see also United States v. McCluskey*, 2013 WL 12330139 at *1 (D.N.M. May 28, 2013) (adopting the Eleventh Circuit *Battle* standard).

Other courts have held that "§ 3593(a) good cause must focus on the diligence of the government in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained." *United States v. Le* ("*Le II*"), 316 F.Supp.2d 343, 348-49 (E.D. Va. 2004); *see also Spurlock*, 782 F.Supp.3d at 1015 (same); *United States v. Constanza-Galdomez*, __ F.Supp.3d __, 2025 WL 1712436 at *11 (D. Md. June 18, 2025) (same).

That is, "absent reasonable diligence, there can be no good cause." *Le II*, 316 F.Supp.2d at 349 (collecting cases). Regardless of the standard applied, the burden is on the Government to demonstrate good cause. *Id.* ("[I]t is equally clear from the text of § 3593(a) that the burden is on the government to show reasonable diligence and hence good cause for amending the Death Notice."). At least one court has interpreted the second prong of the *Battle* test for good cause—"no deliberate delay"—to be a "diligence" inquiry under *Le II*. *See United States v. Merriweather*, 2014 WL 1513256 at *6-7 (N.D. Ala. Apr. 14, 2014).

The question whether a No-Seek Notice may be amended into a Seek Notice under the FDPA does not appear to have been addressed previously. The *Constanza-Galdomez* court concluded that "the purpose of Section 3593(a) is to ensure that the government can only change its mind regarding a death notice when there is good cause to do so." 2025 WL 1712436 at *11; *see also Spurlock*, 782 F.Supp.3d at 1015 ("[A]t a minimum, Section 3593(a) requires the government to make a showing of good cause why, under the facts and circumstances of the case, it should be permitted to amend a no-seek notice."). The *Spurlock* court declined to address whether an amendment from a No-Seek to a Seek Notice is permitted under the FDPA, having found that the minimum possible requirement of good cause did not exist. *Id. at* 1014-15 ("[T]he FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so. . . . Because . . . the government has failed to meet this minimum possible requirement [of good cause], the Court need not decide as a matter of statutory interpretation whether Section 3593 prohibits reversal of a no-seek decision *altogether*." (emphasis in original)).

14

### III.   DISCUSSION

**A.    Timeliness of the Government's Seek Notices**

The Government makes two arguments regarding timeliness of their Seek Notices.  First, the Government argues that the March 7, 2024 Section 3593 Notice deadline was set in anticipation of a March 18, 2024 trial date, and that when the trial date was vacated, "the need for a March 2024, notice deadline also ceased to exist."  (Dkt. No. 180 at 2).  Second, the Government argues that to the extent that the deadline "retain[ed] its currency," "identifiable exigencies" justify an extension of the Court's deadline.  *Id.*  The Government identified the change in administration and the accompanying "dramatic attitudinal change[]" towards capital punishment as the exigent circumstances that "should justify an extension of the March 7, 2024, deadline[.]"  *Id.* at 3.

The burden normally rests on the moving party—here, the Government—to provide justification to change a deadline established by the Court.  *See Ogrizovich v. Cuna Mut. Group*, 2012 WL 12895054 at *2 (W.D. Pa. Oct. 12, 2012) ("[T]he moving party[] has the burden to demonstrate 'good cause' before the Court will allow an amended pleading[.]"); *Mora v. New Jersey Off. of Pub. Def.*, 2025 WL 2393377 at *2 (D.N.J. Aug. 18, 2025) ("To permit an untimely amendment, the moving party bears the burden of establishing 'good cause' for its failure to comply with the applicable scheduling order's deadline for amending the pleadings.").  Accordingly, the Court will examine the arguments advanced by the Government to determine if it has met its burden.  As discussed below, the Court concludes that the Government has failed in this regard.

#### 1.   Validity of the Court's March 7, 2024 Deadline

As this Court remarked in it July 11, 2025 Memorandum Opinion and Order, the "broad, inherent power to control their dockets," with which district courts are entrusted, extends to setting and enforcing deadlines, including deadlines for filing either a Section 3593 Seek Notice or a No-

Seek Notice. *Cole*, 2025 WL 1918001 at *3. It is undisputed here that the Court set a deadline of March 7, 2024 by which the Government was to file "its Notice concerning whether the United States intends to seek the death penalty in this matter." (Dkt. No. 37 at 2). As Defendants correctly note (Dkt. No. 186 at 18-19, 22), there is also no dispute that the Court set this specific date as the Section 3593 Notice deadline based on the Government's proposal of that date, (Dkt. Nos. 36, 37), and that the Government never sought an extension of that deadline. The Court is of the view that the Government must have known from even before it filed its No-Seek Notice on March 1, 2024 that the trial would not proceed on March 18, 2024.[8] Nonetheless, the Government never sought to extend the Section 3593 Notice deadline in conjunction with the continuances in the actual trial date. Contrary to the Government's contention, there is nothing in the record of this case which suggests that the March 7, 2024 deadline for a Section 3593 Notice was tethered to a specific trial date—let alone the March 18, 2024 date—such that a continuance of the trial date would automatically vacate or otherwise affect the Section 3593 Notice deadline.[9]

---

[8] Pursuant to 18 U.S.C. § 3161(c)(2), trial cannot commence less than 30 days after a defendant's initial appearance. Thus, as of at least February 23, 2024, when Defendant Cole's Initial Appearance was scheduled for March 11, 2024, a March 18, 2024 trial date would not only have contravened Defendant Cole's rights under the Speedy Trial Act, it would also have been a sheer impossibility for a complex case such as this.

[9] "An analytical framework focused too narrowly on the date of the Death Notice in relation to the scheduled trial date . . . would have the ironic effect of disincentivizing the sort of rigorous case management utilized by this Court to protect the especially sensitive liberty interest at stake in a capital case." *Ponder*, 347 F.Supp.2d at 271. Thus, it is not unusual for courts to set Section 3593 Notice deadlines even in the absence of a concrete trial date. *See, e.g.*, *United States v. Rivas-Moreiera*, 2023 WL 11960650 at *2 (E.D. Tex. Oct. 7, 2023) (setting a Section 3593 Notice deadline without setting a trial date while noting that the Government—incorrectly—"appears to contend that the court should not set a deadline for its notice under § 3593(a) without first establishing a trial date"); *United States v. Jordan*, No. 18-cr-67 (S.D. Miss. Sept. 27, 2018) (Dkt. No. 108) (setting a Section 3593 Notice deadline while stating that "[t]he trial of this action and motion deadlines will be set at a later date").

Indeed, by the time the March 18, 2024 trial date was continued on March 4, 2024—to a date to be set at the next calendar call—the Government had already timely filed its No-Seek Notice on March 1, 2024. Thus, there was no outstanding Section 3593 Notice deadline to be vacated, continued, or in any way changed. However, now that the Government decided to reconsider its timely-filed No-Seek decisions—491 days after the Court's deadline and 497 days after it complied with that deadline—it purports to retroactively take issue with the original deadline to which it adhered. In so doing, the Government presumptuously—and obviously incorrectly—assumes that it falls within the scope of its authority to determine that, because of a trial continuance that occurred after the filing of its No-Seek Notice, "the need for" the Section 3593 Notice deadline with which it complied "ceased to exist," or that the original deadline lacked "force" or "currency." (Dkt. No. 180 at 2). Such a view diverges from reality. While the Government clearly has authority over many things, managing the cases on the Court's docket is not one of them. *See Constanza-Galdomez*, 2025 WL 1712436 at *11 ("When the government comes before a court, it does so as a litigant. Litigants do not enjoy a *court's* inherent powers." (emphasis in original)). Thus, the Court rejects the Government's contention that the validity of the Court's March 7, 2024 Section 3593 Notice deadline is open to question.

### 2. "Exigent Circumstances"

In the No-Seek Notice, the Government informed Defendants that it "intends to proceed with either a non-capital trial or plea agreements in this matter and **will not** seek the death penalty for either Enock Cole or Jiovoni Smith." (Dkt. No. 44 at 1 (emphasis in original)). The Government also informed the Court that "a special hearing to determine whether a sentence of death is justified pursuant to 18 U.S.C. § 3593(a) is not requested." *Id.* Consequently, the Magistrate Judge terminated the appointment of learned counsel—additional counsel to which Defendants are entitled if they are capital defendants. *See United States v. Casseus*, 282 F.3d 253,

256 (3d Cir. 2002) (holding that "after the government declared that it would not seek the death penalty, the [defendants] were no longer capital defendants" and therefore no longer entitled to learned counsel under 18 U.S.C. § 3005). Indeed, as Defendants correctly argue (Dkt. No. 186 at 19-20), in inviting Defendants and the Court to conclude that the death penalty issue was fully resolved by the Government's compliance with the deadline for a Section 3593 Notice—thereby inviting preparation for trial under non-capital procedures rather than the far more extensive capital procedures, and without the expertise of learned counsel for Defendants[10]—the Government waived any dispute that the March 7, 2024 deadline was valid and final. *Cf. Spurlock*, 782 F.Supp.3d at 1005 ("[T]he government 'intentionally relinquished or abandoned' any challenge to the August 2024 deadline [for a Section 3593 Notice] . . . by failing to timely raise it.").

Notwithstanding having waived its rights to challenge the March 7, 2024 deadline, the Government attempts to revisit the validity of the Section 3593 Notice deadline and excuse its failure to timely object to the imposition of the deadline by claiming that the Government's "dramatic attitudinal changes" towards the death penalty and "unusual change in political leadership" constitutes "exigent circumstances" that permits the Government to revisit a deadline with which it complied and reverse course on a decision upon which the Court and Defendants fundamentally predicated their respective trial preparations. (Dkt. No. 180 at 2-3).[11]

"Exigent circumstances" is a doctrine typically applied in the Fourth Amendment context to permit a warrantless search in "limited situations" where "the need for effective law enforcement

---

[10] *See United States v. McGill*, 2010 WL 1571200 at *3 (S.D. Cal. Apr. 16, 2010) ("A defendant in a federal capital case is entitled to more procedural protections than other federal criminal cases.").

[11] It is additionally telling that while the Government argues that the circumstances "should justify an extension of the March 7, 2024 deadline," *id.* at 3, the Government never filed such an extension request.

trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion." *United States v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006). Examples of exigent circumstances include: "hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others." *Id.* Equating the kind of exigency that flows from the "hot pursuit of a suspected felon" to a policy change stemming from a change in administration resulting from an election that occurs every four years is a quintessential case of "apples and oranges." Rather, Defendants correctly summarize "exigent circumstances" as being "the existence of a true emergency." (Dkt. No. 186 at 23). Moreover, it is notable that exigent circumstances cannot excuse the Fourth Amendment's warrant requirement "if the government deliberately creates them." *Coles*, 437 F.3d at 366. Here, however, the executive branch appears to have created its own "exigency" by choosing to adopt a new policy, declaring its new policy an "exigent circumstance," and then seeking to apply its new policy retroactively to reverse positions in litigation to meet its current preference. This Court sees no reason to convert a Fourth Amendment exception to the warrant requirement, which was designed for a completely different purpose, into a doctrine that would permit the Government to self-create opportunities to reconsider past No-Seek death penalty decisions based upon mere policy changes. To the contrary, there is every reason not to expand an inapplicable doctrine without any legal basis to do so—and the Government has provided none. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (stating that parties are "prohibit[ed] . . . from deliberately changing positions according to the exigencies of the moment[.]").

In short, the Court rejects the Government's attempt to retroactively challenge the validity of this Court's March 7, 2024 Section 3593 Notice deadline long after the Government has complied with the same, based on its self-created purported "exigent circumstances."

### 3. The Government's Seek Notices are Untimely

For decades Courts have routinely taken a dim view of the Government filing a Section 3593 Notice beyond a court's deadline. *See United States v. Rosado-Rosario*, 1998 WL 28273 at *4 (D.P.R. Jan. 15, 1998) (stating, in regards to the Government's "fail[ure] to abide by our orders to timely file its notice of intent to seek the death penalty," that "[n]oncompliance with local rules, as well as noncompliance with court orders, will, therefore, not be tolerated."); *Ball I*, 2006 WL 8570266 at *1 ("The government asserts that it should be excused from missing the September 15 [Section 3593] filing deadline because government counsel thought that date was a status date and not a deadline. . . . That I cannot do."); *Yandell*, 2023 WL 12087482 at *5 ("[T]he government does not explain why it could not comply with the court's order. Nor has it justified its request for an extension filed on the date [the Section 3593] notice was due, especially in the face of a rapidly approaching trial date," and noting that a later deadline "as the government now requests would disrupt the parties' efforts to prepare for trial."); *United States v. Dangleben*, 2025 WL 1423842 at *5 (D.V.I. May 16, 2025) ("Nonetheless, the fact remains that the court-ordered deadline for filing a Section 3593 notice has expired."). Indeed, "there are few choices, perhaps none, that could more thoroughly upend a district court's efforts to manage a trial than a late-breaking decision to seek the death penalty." *Yandell*, 2023 WL 12087482 at *4. As one court aptly concluded:

> [N]oting that it now has filed, albeit out of time, notices of intent to seek the death penalty, the government advances what is perhaps the most troublesome of its arguments. It claims that since the death penalty statute requires only that the notice be filed a reasonable time before the trial, that is all that matters here. That proposition necessarily would mean that a court properly may set pretrial deadlines but has no power to enforce them. No case cited by the government reaches that conclusion. Nor is such a perverse result fathomable. Courts set and enforce pretrial deadlines by which parties must act all the time. Such deadlines are applied against the government and defense alike. Courts fix pretrial deadlines by which a party must provide notice even where other provisions of law call for a party merely to give notice reasonably in advance of the trial or proceeding. To hold that a court

cannot fix <u>and</u> enforce such pretrial deadlines would undermine the orderly, expeditious and fair administration of criminal justice in ways difficult to fully imagine.

*Ball I*, 2006 WL 8570266 at *2 (emphasis in original).

The facts here are clear. There was a deadline, proposed by the Government and set by the Court, to which the Government adhered when it filed, on March 1, 2024, the No-Seek Notice informing the Court and Defendants that it did not intend to seek the death penalty for either Defendant. (Dkt. Nos. 36, 37, 44). Ultimately, the Government filed Seek Notices—491 days after the deadline—reversing its original No-Seek decisions. (Dkt. Nos. 175, 176). The Government provides no precedent wherein a court has permitted such untimeliness, and the Court is aware of none. To the extent that the Government now seeks to rely on the Seek Notices, the Court finds that they are untimely. In the management of its docket, the Court undoubtedly has the authority to set deadlines and enforce them—as it will do here.

This Court thus finds, as it has in the past, that "[i]t is important to correct counsel's mistaken belief regarding the optional nature of deadlines." *Darrah*, 2011 WL 6181352 at *4. Just as the Government is not at liberty to ignore the Court's deadlines, it does not enjoy the luxury of declaring them changed at its whim, as it attempts to do here. *Cf. United States v. Ball* ("*Ball II*"), 2006 WL 8570265 at *1 (D.D.C. Sept. 19, 2006) (noting that "the fifth anniversary of the September 11, 2001 attacks" did not excuse non-compliance with the Court's September 15, 2006 deadline for a Section 3593 Notice). Simply stated, the Court "set a reasonable deadline regarding an important issue and expected compliance with that deadline." *Spurlock*, 782 F.Supp.3d at 1007; *see also Gomez-Olmeda*, 296 F.Supp.2d at 86 ("In a matter as critical as a death penalty prosecution, this court should expect nothing less than strict compliance with the local and federal rules [governing deadlines and timeliness respectively] that have been established to help ensure a criminal defendant is not unduly prejudiced when his very life is at stake."). The Government

complied with the deadline.  It is now fanciful to pretend that events which occurred over one year later somehow negated a critical issue that was addressed, resolved, and acted upon by the Court and the parties alike, simply because the Government says so.

The Government's untimely filing that exceeds the Court's deadline by 491 days—on an issue that is basically a matter of life and death, and would greatly impact both the parties' and the Court's processes, procedures, and resources—will not be accepted by the Court.  *Cf. Spurlock*, 782 F.Supp.3d at 1008 ("[T]he broad risks of last-minute uncertainty are apparent from the harm already done to these proceedings.").  Accordingly, the Court finds that the July 11, 2025 Seek Notices filed by the Government are untimely.  The Court will exercise its broad and inherent authority to manage its docket by striking the Government's untimely Seek Notices.  *See Dietz*, 579 U.S. at 47; *Yandell*, 2023 WL 12087482 at *4 ("Because th[e death penalty] decision has so many weighty consequences for a trial, district courts must have authority to prevent the disruption that an untimely disclosure would create."); *United States v. Colon-Miranda* ("*Colon-Miranda II*"), 985 F.Supp. 36, 39 (D.P.R. 1997) ("This court will not cripple the wheels of justice and contaminate judicial economy because of the government's inability to timely make its [Section 3593] motion.").  The Government's untimely filing of its No-Seek Notice 491 days beyond the Court-ordered March 7, 2024 Section 3593 Notice deadline provides an independent basis for striking the untimely Seek Notices.  *See Spurlock*, 782 F.Supp.3d at 1007 ("[S]triking the notice is not only within the Court's authority, it is ultimately the only remedy which affords appropriate weight to that authority. A continuance would . . . effectively reward the violation and render the notice deadline powerless to serve its well-founded purposes.").

### B.    Amendment of No-Seek Notice and the Good Cause Requirement

#### 1.  The Government's Arguments

The Government argues that it is legally empowered to file Seek Notices after having previously filed No-Seek Notice for three reasons.  First, it argues that the Federal Death Penalty Act ("FDPA") only sets forth requirements for announcing a decision to seek the death penalty, and "does not discuss or mandate the inverse" or "contemplate a notice of intent *not* to seek the death penalty."  (Dkt. No. 180 at 9 (emphasis in original)).  The Government argues that because the FDPA "is silent on the subject" of No-Seek Notice and it is only a court convention to call for such a filing, "no statutory provision obliges [the Government] to justify a change of position on the decision whether to pursue capital punishment in the first instance."  *Id.*; (Dkt. No. 199 at 6-7).

Second, the Government argues that the decision whether to seek the death penalty is a type of "prosecutorial decision[]" affirmatively protected as a "core executive constitutional function."  *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996); *see also United States v. Lee*, 274 F.3d 485, 489 (8th Cir. 2001).  As such, the Government maintains that the Attorney General of the United States is "the ultimate decisionmaker on the question of whether the government will seek the death penalty or withdraw a previously filed death notice" and that—despite the filing of any No-Seek Notice—the Government "should retain its traditional charging discretion to advocate for any punishment permissible under the law."  (Dkt. No. 180 at 9).

Third, the Government argues that it is not bound by its prior No-Seek Notice, because "absent some contractual obligation or other demonstrable legal impediment," the Government retains the above-referenced "charging discretion."  *Id.*   The Government states that while "[p]resumably" they would have an obligation to honor a *plea agreement* that agreed not to seek the death penalty in exchange for a plea, the No-Seek Notice was a "unilateral decision" that

required "nothing of value" from Defendants, and therefore Defendants have "no commensurate right to enforce the prosecution's earlier representation about the death penalty." *Id.*

The Government's arguments fall flat. The upshot of these arguments is that a No-Seek Notice is a legal nullity and that the Government has carte blanche to declare that it is not seeking the death penalty and then change its position at will, with no accountability or consequences. This, of course, cannot be the law—with the utter chaos and disruption to the proceedings that would ensue, and that this Court has now experienced first-hand. *Cf. United States v. Suarez*, __ F.Supp.3d __, 2025 WL 2158348 at *4 (N.D. Cal. July 18, 2025) (Ruling in favor of the defendants, and noting "[t]he Government has put this case in limbo [with its announcement to revisit the No-Seek Notice]. . . . [T]he Government appears to believe that it has an unfettered right to change its mind at any time.").

Equally unavailing is the Government's "core executive constitutional function," or "charging discretion," argument. The Court does not question that the decision whether to seek the death penalty and charging decisions fall within the purview of the Government. This, however, is not the issue. Rather, the issue is whether the Government's authority is unfettered— that is, whether the Government has the right to do whatever it wants to do and whenever it chooses to do it, irrespective of court deadlines and rules, and the rights of defendants. The answer is obviously no. *See United States v. W.R. Grace*, 526 F.3d 499, 515 (9th Cir. 2008) ("The government's discretion to investigate and present its case does not override the district court's authority to manage the trial proceedings—including by setting discovery and disclosure deadlines[.]").

Finally, the notion that something "of value" must be obtained from Defendants to create a right to enforce the earlier No-Seek representation is also fallacious. It is unclear from whence

this argument comes.  Surely the Government is not suggesting that courts and defendants cannot trust and rely on oral or written representations made by the Government in legal proceedings in the absence of "something of value" being received from defendants.  *See Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970) ("To say to these appellants, 'The joke is on you. You shouldn't have trusted us,' is hardly worthy of our great government."); *Menges v. Dentler*, 33 Pa. 495, 500 (1859) ("Men naturally trust in their government, and ought to do so, and they ought not to suffer for it."). Nor could the Government be suggesting that the court's ability to enforce its own orders is dependent on something "of value" being received from defendants.  In any event, the fact that the Court and Defendants gave credence to the Government's written representation that it would not be seeking the death penalty in determining the Court's processes and procedures for this matter and in Defendants' preparation of their cases—including, without the expertise and resources to which they are entitled in a capital-eligible case—is of much greater significance in the present context than the "something of value" standard that the Government has concocted.

In short, these arguments by the Government are rejected.

### 2.  Statutory Interpretation

Both courts to have considered the reversal of a No-Seek Notice into a Seek Notice have held that Section 3593's amendment provision requiring good cause to amend a Section 3593 Notice applies to the amendment of a No-Seek Notice.[12]  *Spurlock*, 782 F.Supp.3d at 1014-15; *Constanza-Galdomez*, 2025 WL 1712436 at *11.  The *Spurlock* court reasoned:

---

[12] The *Spurlock* court held that "the FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so."  782 F.Supp.3d at 1014.  However, the court determined that it "need not decide as a matter of statutory interpretation whether Section 3593 prohibits reversal of a no-seek decision *altogether*" because "at a minimum, Section 3593(a) requires the government to make a showing of good cause why . . . it should be permitted to amend a no-seek notice" and "the government [] failed to meet this minimum possible requirement"  *Id.* at 1015 (emphasis in original).  As discussed above, here too, the Government has failed to show

Reading the statute to allow reversal of a no-seek notice without good cause, as the government proposes, would run contrary to the fundamental principles of statutory construction and public policy. Under that reading, the government would be required to show good cause to amend a single aggravating factor under 18 U.S.C. § 3593(a)(2), but would be at total liberty to modify its representations in the far more significant manner—where a defendant's rights and a court's resources are most at stake—by deciding at any time, for any reason, to seek the death penalty, after formally declaring the opposite. This interpretation is nonsensical for many reasons, including because reversal of a no-seek decision involves the noticing of many new aggravating factors, which are clearly the central subject of 18 U.S.C. § 3593(a)(2)'s good cause requirement. A reversal of a no-seek decision spurs more radical structural changes to the proceedings than any other type of amendment.

782 F.Supp.3d at 1014. The *Constanza-Galdomez* court concluded:

The statute seems to contemplate a less dramatic change than the one in this case— the true amendment of a pre-existing death notice. The government insists that the statute does not say anything about a new death notice, even if a change in position, and that the government is not required to have good cause to entirely change its mind. True, it is a little dismissive to refer to the momentous switch from a formal no-seek notice to a death notice as a mere "amendment." But the purpose of Section 3593(a) is to ensure that the government can only change its mind regarding a death notice when there is good cause to do so. If Congress is concerned by the lesser, surely it would also be concerned with the greater. This Court agrees with Defendants that the principles Congress outlined in Section 3593(a) apply equally to this case.

2025 WL 1712436 at *11.

This Court finds the reasoning of both the *Spurlock* court and the *Constanza-Galdomez* court persuasive and aligned with the purpose of Section 3593 in establishing procedural protections for capital defendants. It simply cannot be—as the Government contends—that the filing of a No-Seek Notice represents a legal nullity, to which the FDPA attaches no significance. As the court in *Spurlock* aptly stated: holding that the Government may amend a No-Seek Notice to a Seek Notice without good cause would create an "unworkable and contradictory" outcome, such that "defense counsel and the Court would have to continue to treat every single capital-

---

good cause, and thus this Court need not reach the question whether the FDPA—or any other authority—prohibits the reversal of a No-Seek Notice altogether.

eligible case as a death case, regardless of an earlier representation that the government would not seek death, lest the government attempt to reverse its decision at the last minute." 782 F.Supp.3d at 1008. That is precisely the outcome that the FDPA seeks to prevent. Thus, this Court concludes that assuming, without deciding, that the FDPA permits the reversal of a No-Seek Notice into a Seek Notice, Section 3593 requires the Government to demonstrate good cause to do so.

### C.    Good Cause

As previously noted, courts have determined that good cause is required even assuming that the FDPA empowers the Government to amend a No-Seek Notice in a manner that reverses its statement of intent. Defendants argue that the Government has not sought leave to amend nor shown good cause in this case. (Dkt. No. 186 at 30-33). The Court agrees for the reasons that follow.

This Court finds that the three-part test set forth by the Eleventh Circuit—aligned with the standard used by a sister district court in the Third Circuit and based on the same authority from within this Circuit—is the appropriate standard to apply. *Battle*, 173 F.3d at 1347-48 (citing *United States v. Pretlow*, 770 F.Supp. 239, 242 (D.N.J. 1991)).[13] This test finds good cause to amend a Section 353 Notice "where (1) new factors have plausible connection to facts, (2) [there is] no deliberate delay by [the] Government, and (3) [there is] no prejudice to defendant."[14] *Id.*;

---

[13] *Pretlow* interpreted 21 U.S.C. § 848(h), governing penalties for individuals engaging in a continuing criminal enterprise, which required the Government to provide notice in death penalty cases "a reasonable time before trial." 21 U.S.C. § 848(h) (1998). Subsection 848(h)(2) provided that "[t]he court may permit the attorney for the Government to amend this notice for good cause shown." *Id.* § 848(h)(2) (1998). Subsection § 848(h) was repealed effective March 2006. Pub. L. 109-177, title II, § 221(2), 120 Stat. 231. 21 U.S.C. § 848 is now subject to the procedural requirements of the FDPA rather than the repealed subsection 848(h).

[14] This Court is of the view that the *Le II* test—that Defendants seek to have this Court adopt—which requires the Government to show only "diligence" and not prejudice is insufficient given the importance of the Section 3593 Notice in defining the parameters of a defendant's required defense and affording the necessary lead time required to develop mitigation strategies. In any

*see also Cooya*, 2012 WL 2321572 at *2 (stating "good cause" in the Section 3593 context exists "whenever the government can demonstrate that there was no deliberate delay by the government and no prejudice to the defendant" (citing, *inter alia*, *Pretlow*, 770 F.Supp. at 242)).

The Government bears the burden to establish the elements of good cause.  *Le II*, 316 F.Supp.2d at 349 ("[T]he burden is on the government to show . . . good cause for amending the Death Notice.").  With regards to the third prong of the *Battle* test, the Government alleges that there was no prejudice to Defendants as a result of the untimely Seek Notices, claiming that Defendants have "provided no authority on the issue of prejudice" and arguing that "[m]erely saying they will be prejudiced does not demonstrate prejudice."  (Dkt. No. 199 at 10).  The Government points to the appointment of learned counsel in April 2025 and the commencement of mitigation investigations in an attempt to undercut Defendants' claims of prejudice and support the claimed lack of prejudice.  *Id.*

Contrary to the Government's assertions, however, and notwithstanding that the burden rests on the Government to establish good cause—and therefore the absence of prejudice—Defendants identify various ways in which they have been prejudiced by the untimely Seek Notices, including the following:  (1) Defendants have been deprived of learned counsel to which they would have been entitled, for over a year; (2) Defendants have been deprived of mitigation specialists, to which they would have been entitled, for over a year; (3) Defendants have lost the opportunity to access and preserve mitigation evidence during the period of time in which this case proceeded as a non-capital case; and (4) Defendants would have made different pretrial decisions, including decisions related to continuances, discovery, and plea negotiations.  (Dkt. No. 186 at 51-

---

event, as discussed previously, whether framed as "no deliberate delay" as in the *Battle* test, or "reasonable diligence" as in the *Le II* test, the Court finds the two formulations of this prong of the good cause test to be substantially similar.

52).  Defendants further identify a multitude of specific and concrete actions that they would have taken if the Government had not affirmatively stated its intention not to seek the death penalty and had instead indicated from the outset that it intended to seek the death penalty, including:

- Insist on the appointment of learned counsel for Defendant Cole from March 2024;
- Insist that the learned counsel and mitigation team appointed—and then terminated 15 days later due to the Government's No-Seek Notice—for Defendant Smith meet with Defendant Smith;
- Direct investigator resources towards mitigation investigation from March 2024 and prepare a mitigation defense for Defendants from March 2024;
- Investigate Defendant Cole's potential intellectual disability as a possible defense from March 2024;
- Not request or consent to any continuances of the trial date, and instead demand an immediate trial;
- Engage in pretrial strategies appropriate for a capital case, instead of engaging in pretrial strategies appropriate for a non-capital case; and
- Vigorously attempt to negotiate a favorable plea agreement with the Government.

(Dkt. Nos. 186 at 27, 186-1 at 2, 186-7 at 2-3).  Taking a page from the Government's book, merely claiming that there is no prejudice does not establish the absence of prejudice—especially in the face of the litany of examples provided by Defendants.  (Dkt. No. 199 at 10); *see Constanza-Galdomez*, 2025 WL 1712436 at *7 ("The government's willful blindness to the differences between an ordinary trial and a capital trial are startling. On this issue, and throughout its brief, the government neglects to engage with the Defendants' right to learned counsel, the extended jury selection process in capital cases, or the immense work involved in preparing a constitutionally effective mitigation case (among other things).").

It is undeniable that the possibility of the imposition of a sentence of death significantly impacts and complicates every phase of the proceedings—from pretrial to jury selection to the guilt phase to the penalty phase.  And, in the context of these more complicated proceedings,

29

defendants are entitled not only to counsel, but also to learned counsel—individuals with special expertise in litigating capital cases.  18 U.S.C. § 3005; *see also United States v. Coles*, 474 F.Supp.3d 661, 664 (M.D. Pa. 2020) (stating that the purpose of learned counsel is to "provide those charged with a capital offense [with] 'specialized help' from attorneys with 'a separate and unique base of knowledge, training, and experience,' and to 'reduce the chance that an innocent defendant would be put to death because of inadvertence or errors in judgment of his counsel.'" (citation modified)).  It is no small matter that Defendants were deprived of the learned counsel to which they would have been entitled from the outset of these proceedings.  They were deprived of the special expertise that the learned counsel would have brought for approximately fourteen months—from the termination of Defendant Smith's learned counsel on March 4, 2024 to reappointment of learned counsel on April 21, 2025—of the approximately nineteen and one-half months that this case would be in existence as of the date of the September 8, 2025 trial.  Similarly, developing a mitigation defense is time-consuming and requires special expertise, and it is virtually impossible for defendants to develop an effective mitigation strategy until they are informed of the aggravating factors that the Government sets forth in a Seek Notice as justification for seeking the death penalty.  *Cf. Suarez*, 2025 WL 2158348 at *4 ("It is the Government that has left defense counsel to guess what charges might be brought as they prepare mitigation reports. . . . Moreover, Defendants have been given the opportunity to make a mitigation presentation under time constraints that arguably render that opportunity meaningless.").

Indeed, courts have found prejudice to defendants in circumstances similar to these.  *See Dangleben*, 2025 WL 1423842 at *5 ("Because Defendant has been proceeding according to the 'no-seek' decision, he has been without the benefit of learned counsel for over a year and, thus, his trial preparation, as well as preparation for any re-review by the Capital Review Committee, is

30

not what it would have been had a 'no-seek' notice not been filed. Consequently, despite the fact

no trial date is currently set, the prejudice to Defendant cannot be overstated."); *Spurlock*, 782

F.Supp.3d at 1011 ("[T]here is no real question that an additional delay would cause some degree

of additional prejudice against [Defendant] – because of the added pursuit of capital punishment

itself [and] the impact of a no-seek notice on defense preparation[.]"); *see also Colon-Miranda II*,

985 F.Supp. at 39 ("The prejudice defendants would suffer from this tardiness [in filing a

Section 3593 Notice] is so overwhelming that it would prevent them from securing any effective

defense whatsoever.").   The theme in these cases is consistent:  where a defendant has been

proceeding for a significant period of time as a confirmed non-capital defendant and the

Government attempts to reverse course late in the proceedings, the lost opportunity in terms of

time, resources, and preparation to the defendant is severely crippling.

In view of the foregoing, the Court finds that the Government has not borne its burden of

showing good cause, because, at a minimum, Defendants will be undeniably and significantly

prejudiced by the Government's untimely reversal of the No-Seek Notice.  *See Battle*, 173 F.3d at

1347-48.[15]  Thus, assuming—without deciding—that the FDPA permits the amendment of a No-

_____

[15] Even if the alternative *Le II* test for good cause that focuses on a "diligence" inquiry were to be
used, the same result would obtain—that the Government has failed to show good cause.  As
implemented by *Spurlock*, "reasonable diligence"—which has been interpreted as similar to the
*Battle* court "no deliberate delay" analysis—appears to require that additional details related to the
offense were uncovered by the Government, which could not have been discovered prior to the
filing of the original Section 3593 Notice.  *Spurlock*, 782 F.Supp.3d at 1015 (citing approvingly
*Battle*, 173 F.3d at 1347); *see also Merriweather*, 2014 WL 1513256 at *6-7 (interpreting the
second prong of the *Battle* test for good cause for "no deliberate delay" to be a "diligence" inquiry
under *Le II*); *United States v. Le* ("*Le III*"), 326 F.Supp.2d 739, 741 (E.D. Va. 2004) (adopting a
"diligence" standard and stating "[b]y requiring the government to act with reasonable diligence
in seeking death notice amendments, the propensity for delay is minimized . . .").  Here, the
Government does not allege any new information that arose following the filing of the No-Seek
Notice to justify the reversal of the No-Seek Notice.  Instead, the Government merely points to an
"unusual change in political leadership and federal death penalty policy."  (Dkt. No. 180 at 3).
However, given the finality of a sentence of death and the rights to which a capital defendant is

Seek Notice to a Seek Notice, the Court finds that the Government has violated the FDPA by attempting to amend its decision from No-Seek to Seek without showing good cause to amend. The absence of good cause to amend is another independent basis for striking the Seek Notices. *See Le II*, 316 F.Supp.2d at 351 ("[T]he Amended Death Notice must be stricken because the government has not shown good cause[.]").

### D.     Section 3593 Requirements

Arguing that the filing of its Seek Notices 52 days before trial was "[e]minently reasonable" (Dkt. No. 180 at 7), the Government argues that its Seek Notices fulfill all requirements under Section 3593, including that the Seek Notices were filed "a reasonable time before trial." (Dkt. No. 180 at 4). The Government claims that its filing of the Seek Notices "did not meaningfully alter the factual landscape of this case, even if it amplified certain legal theories of the case," and therefore "do[es] not require the defendant to substantially alter their multi-year preparations for trial." *Id.* at 8. On the other hand, Defendants argue, *inter alia*, that both *Ferebe* and *Wilk* adopt an "objective reasonableness" standard based on a "totality of the circumstances" analysis which compels the conclusion that the filing of Seek Notices only 52 days before trial does not constitute a "reasonable time before trial" as required under Section 3593. The Court agrees with Defendants. (Dkt. No. 186 at 33-51).

---

entitled, the Court does not view a mere change in policy—whether by new or existing leadership, and whether termed usual or unusual—to constitute good cause to change a No-Seek to a Seek decision under the circumstances discussed herein. *See Le II*, 316 F.Supp.2d at 347, 350 (finding the Government did not have good cause to amend a Death Notice because "all of the information in the Amended Death Notice was known to the government before the filing of the original Death Notice"). Thus, the Government has not borne its burden of proof to demonstrate that there was "no deliberate delay" or "reasonable diligence" in their decision-making. *See Battle*, 173 F.3d at 1347-48.

1.  **"A Reasonable Time Before Trial"**

Courts which analyze whether a Seek Notice was filed within a "reasonable time before trial" when considering the reversal of a No-Seek Notice have applied either *Ferebe* or *Wilk*. *Spurlock*, 782 F.Supp.3d at 1018-22 (*Wilk*); *Constanza-Galdomez*, 2025 WL 1712436 at \*5-9 (*Ferebe*).[16]    However, Defendants correctly note that both *Ferebe* and *Wilk* addressed circumstances where the death penalty remained a possibility for the duration of pretrial proceedings.  *See Wilk*, 452 F.3d at 1223 (noting the government filed the death notice "by the . . . deadline set by the district court"); *Ferebe*, 332 F.3d at 724-26 (making no note of a pretrial deadline for the filing of a death notice or a No-Seek Notice); *United States v. Ferebe*, 2005 WL 1429261 at \*2-3 (D. Md. June 16, 2005) (noting, on remand, that despite the fact that "the government had not yet filed a Death Notice," "the case was on schedule for a death penalty trial"); *Spurlock*, 782 F.Supp.3d at 1020 ("The mere existence of the no-seek notice also distinguishes this case from *Wilk*, where 'from the start, all parties knew [it] was a likely death penalty case[.]'"); *Constanza-Galdomez*, 2025 WL 1712436 at \*6 ("*Ferebe* is ordinarily applied in cases where the death penalty was always a possibility, but the government delayed filing a formal death notice."). Thus, the situation here—with the belated change from No-Seek to a Seek Notice would seem to present an even more compelling case for taking a very close look at the reasonableness of the time before trial.  While the application of either *Ferebe* or *Wilk* illustrates the lack of

---

[16] A Seek Notice—even an amended Seek Notice—must be filed "a reasonable time before trial" under Section 3593.  *See Le III*, 326 F.Supp.2d at 741 ("Once good cause has been shown [for an amended Seek Notice to be filed], courts in this circuit are still obligated to assess whether the amended death notice was filed a reasonable time before trial under *Ferebe*.").  Thus, the "reasonable time" requirement must be met regardless of whether the Seek Notices are viewed as amendments to the No-Seek Notice or as Seek Notices entirely independent of the prior No-Seek Notice, as the Government urges under its "legal nullity" theory.  (Dkt. No. 180 at 9).

reasonableness of the timing of the Government's Seek Notices, for reasons discussed herein, the Court adopts *Ferebe*'s four-factor approach.  332 F.3d at 737.

Under the first *Ferebe* factor, the Court must consider "the nature of the charges presented in the indictment."[17]  332 F.3d at 737.  The Government argues that "[t]his is not a factually complex case," because the majority of the charges "all relate to the same discrete event: the robbery at Castaways where the victim was shot and killed" and the remaining charge—a tampering with evidence charge—does not alter the lack of complexity.  (Dkt. No. 180 at 6).  On the other hand, Defendants point to the factual complexities of this case by citing the over 90 gigabytes of data, over a hundred video and audio files, multiple cellphone extractions, GPS monitoring data, and an alibi defense for Defendant Cole.  (Dkt. No. 186 at 36).

Defendants argue that there are two competing approaches on how to evaluate the nature of the charges: the first asks "whether, from a defense perspective, the charges are so complex or atypical that the days remaining before trial would be insufficient to mount a defense," while the second asks "whether the government should have filed the Death Notice earlier than it did given the nature of the charges in the indictment and the status of the discovery and inspection process." (Dkt. No. 186 at 35 (quoting *Constanza-Galdomez*, 2025 WL 1712436 at *6 (collecting cases)). Defendants urge the Court to adopt the latter approach.  *Id.*  Under that approach, Defendants argue that the Government was "aware of all the facts underlying this case since before filing the original indictment," and "could have sought the death penalty from the beginning of this case," but did not do so.  *Id.*  Because the Court will analyze "the period of time remaining before trial"—which

---

[17] The Court observes that the corresponding *Wilk* factor—the fourth *Wilk* factor—contains virtually identical phrasing.  *Compare Ferebe*, 332 F.3d at 737 ("[T]he nature of the charges presented in the indictment[.]"), *with Wilk*, 452 F.3d at 1221 ("[T]he nature of the charges in the indictment[.]").

incorporates similar considerations as the first approach—under the third *Ferebe* factor, the Court finds adoption of the second approach to be more appropriate, so as to give "independent meaning" to each of the four *Ferebe* factors. *See Constanza-Galdomez*, 2025 WL 1712436 at *6 ("[I]t is best to consider the reasonableness of the government's conduct under this prong, and to delay assessment of reasonableness from a defense perspective until the third prong[.]"). Thus, the inquiry under this prong is "whether the government should have filed the Death Notice earlier than it did given the nature of the charges in the indictment and the status of the discovery and inspection process." *Ponder*, 347 F.Supp.2d at 264 (analyzing *Hatten*, 276 F.Supp.2d 574).

It is undeniable that the Government has been aware of the facts underlying this case and its proposed aggravating factors since the Information was filed in 2023. Two of the Government's three aggravating factors relate to the manner in which the Government alleges the crime was committed: that Defendants each "knowingly created a grave risk of death to one or more persons in addition to the victim of the offense" and "killed the victim [] in an attempt to obstruct justice by eliminating a witness to the robbery." (Dkt. Nos. 175 at 2, 176 at 2). The third aggravating factor that the Government brings against each Defendant relates to a prior conviction, *id.*, the facts of which were knowable and known at the time of the arrest of each Defendant, as Defendants were at the time of arrest serving local sentences. (Dkt. Nos. 14, 15). Thus, the Government clearly could have filed a Seek Notice in response to the Court's March 7, 2024 Section 3593 deadline, and sought the death penalty from the initiation of this case. Further, the Government's understanding of the underlying facts does not appear to have changed since the beginning of the case. For example, there has been no superseding indictment adding new charges or defendants

in the case.[18]  As the *Constanza-Galdomez* court observed, "[n]othing has changed other than the government's view on the death penalty."   2025 WL 1712436 at *7; *see also Hatten*, 276 F.Supp.2d at 578 ("Every factor listed in the Death Notice was known to the Government when it obtained the Superceding Indictment. . . . Despite this fact, the Death Notice was not filed until [nearly four months later, just over a month before trial]."). This is unquestionably true here where the Government candidly acknowledges that the sole basis for the change is a new administration and a corresponding change in policy.   Thus, given the fact that the Government had all the information required to set forth the aggravating factors as they are now articulated from the outset, the first *Ferebe* factor regarding the "nature of the charges" weighs in favor of Defendants.

The second *Ferebe* factor is "the nature of the aggravating factors provided in the Death Notice."  332 F.3d at 737.[19]  The Government argues that many of the alleged aggravating factors were contained in the allegations set forth in the original indictment, and thus Defendants

---

[18] On August 19, 2025, the day after the Court informed the parties of its intended ruling to grant Defendants' Motion to Strike the Seek Notices, the Government filed a Superseding Indictment. (Dkt. No. 239).  The Superseding Indictment added a "Notice of Special Findings" containing the Grand Jury's findings regarding Defendants' ages at the time of the alleged offense, the *mens rea* required under 18 U.SC. § 3591(a)(2), and the aggravating factors that the Government seeks to use as justification for the imposition of the death penalty.  *Id.* at 9-10.  A Notice of Special Findings in an Indictment is a requirement for the Government to seek the death penalty.  *See United States v. Haynes*, 269 F.Supp.2d 970, 979 (W.D. Tenn. 2003) ("[T]he government may only seek the death penalty if mens rea and aggravating factors are explicitly found by the grand jury in the returned indictment" because, as elements that increase the maximum penalty for the alleged offenses, they "must be treated as if they are essential elements of the offense[.]"); *see also Gomez-Olmeda*, 296 F.Supp.2d at 76 (finding an Indictment lacking Special Findings as "legally insufficient to support a sentence of death" and thus striking the Government's Seek Notices); *United States v. Reyes-Castillo*, 2025 WL 755130 at *1-2 (D. Nev. Mar. 10, 2025) (striking the Special Findings in a Superseding Indictment as "immaterial and irrelevant" given the Government's filing of a No-Seek Notice).

[19] The Court observes that the corresponding *Wilk* factor—the fourth *Wilk* factor—contains virtually identical phrasing.  *Compare Ferebe*, 332 F.3d at 737 ("[T]he nature of the aggravating factors provided in the Death Notice[.]"), *with Wilk*, 452 F.3d at 1221 ("[T]he nature of the aggravating factors claimed to support the death penalty[.]").

necessarily were required to prepare to defend themselves against the aggravating factors in the course of mounting their defense against the indictment.[20]  (Dkt. No. 180 at 6).  The Government acknowledges that the Seek Notices also allege that Defendant Cole and Defendant Smith each has a prior murder conviction—Cole, for a murder conviction that is presently on appeal, and Smith for a conviction that occurred in 2020.  However, the Government claims that because those convictions are "matters of public record," "few additional resources will be necessary to investigate and address these aggravating factors."  *Id.*

In response, Defendants highlight the need for counsel to independently and thoroughly investigate Defendants' prior convictions anew, to defend against the Government's use of the same as aggravating factors.  (Dkt. No. 186 at 38-39 (citing ABA Guidelines, Guideline 10.11(I) cmt. ("If the prosecution relies upon a prior conviction [as aggravating evidence] . . . counsel should [] determine whether it could be attacked as the product of an invalid guilty plea as obtained when the client was unrepresented by counsel, as a violation of double jeopardy or on some other basis.")))  Defendants also raise concerns that the use of prior convictions as aggravating factors in this case may present "complex and novel legal issues" that the parties "would have to litigate in the course of a capital trial," such as the fact that Defendant Cole's prior conviction is still on direct appeal and thus not final, and that the facts underlying Defendant Smith's prior conviction do not predate the facts of the instant offense.  *Id.* at 39-40.  Finally, Defendants argue that the victim-impact evidence which the Government may seek to introduce during the penalty phase of

---

[20] Another court has dismissed identical arguments by the Government as "not a serious position." *Constanza-Galdomez*, 2025 WL 1712436 at *7 ("The government agrees that the facts and law at issue are the same now as they were in 2022. But it somehow believes that, because the underlying conduct at issue is the same, Defendants should have no problem preparing for [a capital] trial by September. . . . That is not a serious position.").

a capital trial is "qualitatively different" than defending the same charges in a non-capital case. *Id.* at 38.

As a threshold matter, the Court observes that none of the aggravating factors were contained in the allegations of the Indictment, as the Government claims. The Indictment that the Government references did not contain a "Notice of Special Findings" pursuant to 18 U.S.C. §§ 3591 and 3592, and nowhere in the Indictment did the Government allege that Defendants "knowingly created a grave risk of death to one or more persons in addition to the victim of the offense" or killed the victim "in an attempt to obstruct justice by eliminating a witness to the robbery." (Dkt. Nos. 8, 175 at 2, 176 at 2). The Government argues that the Indictment alleges that an additional individual "was threatened with firearms" and that the victim was killed intentionally during the robbery, therefore Defendants, "[i]n preparing to defend against those allegations in the original indictment . . . necessarily prepared to defend against [the aggravating factors in the Seek Notices]." (Dkt. No. 180 at 6). The Court does not agree that Defendants could, or should, have *inferred* these aggravating factors from the Indictment. Indeed, arguing that defendants can and should be prepared to defend against aggravating factors based upon an Indictment alone completely sidesteps the purpose of Section 3593: to provide specific notice of the aggravating factors that the Government intends to use as justification for a sentence of death separate and apart from other traditional charging instruments.

The Court finds the *Le II* and *Le III* cases instructive in evaluating the third aggravating factor—the prior convictions—contained in each of the Seek Notices filed in the instant case. The *Le II* court stated that the introduction of additional violent incidents as aggravating factors presented "no small task" for the defense due to the burden of proof during the sentencing phase. 316 F.Supp.2d at 353. Indeed, an additional murder allegation "essentially imports a second

38

capital murder trial into the penalty phase of this case." *Id.* (noting that "[g]iven the enormous potential significance of this particular aggravating factor, it is reasonable to assume that defense counsel will wish to leave no stone unturned investigating [defendant's] involvement in the [prior] murder" and that "defense counsel's investigation of these incidents may ultimately lead them to call additional witnesses to defend [defendant] against these serious [aggravating] charges[.]"). The *Le II* court concluded that the court must ensure that defendants have "sufficient time to prepare" "where the investigation of [prior criminal conduct] must necessarily occur simultaneously with the investigation and litigation regarding the murders and other crimes alleged in the indictment." *Id.* at 354. While the "additional violent incidents" in *Le II* and *Le III* constituted several incidents of previously uncharged conduct rather than a single, previously charged criminal conviction, the Court, nonetheless, finds the rationale regarding the amount of time required to investigate and prepare a defense in the penalty phase context applicable.

Given that the Government would seek to use Defendant Cole's and Defendant Smith's prior convictions in a new posture with vastly different stakes than their original state proceedings—that is, to justify the imposition of the death penalty if Defendants are found guilty of the instant offense—Defendants' counsel are required to investigate these prior convictions anew in order to defend properly against their use as justification to impose the death penalty. Once a capital defendant is found guilty and a prior conviction is presented as an aggravating factor, the capital jury must make "an *individualized* determination [whether the death penalty is merited] on the basis of the character of the individual and the circumstances of the crime." *United States v. Con-ui*, 2017 WL 783437 at *11 (M.D. Pa. Mar. 1, 2017) (quoting *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983)) (emphasis in original). This requires the Government to introduce more than the "mere fact of conviction." *Id.* ("What lies behind the mere 'fact of conviction' are

nuances [of that conviction], and to not afford [defendant] a particularized sentencing [based upon those nuances] would be to deprive him of his rights." (citing *Zant*, 462 U.S. at 873-80)).  Indeed, "the function served by the jury at the penalty phase is not to simply consider whether some abstract person with certain types of unparticularized convictions deserves the sentence of death, but rather, whether a particular defendant, given his particular criminal history, the inciden[ts], cause, and features of his underlying convictions, and the particular circumstances that differentiate those crimes from others, deserves the sentence of death."  *Id.*  Thus, the Government's claim that because Defendants' prior convictions are "matters of public record," "few additional resources will be necessary to investigate and address these aggravating factors" at the penalty stage and Defendants should therefore be prepared to defend against them rings particularly hollow and misconceives the depth with which Defendants' counsel must investigate each Defendant's prior conviction when death is at stake.  (Dkt. No. 180 at 6).  Accordingly, the Court finds that the second *Ferebe* factor regarding the "nature of the aggravating factors" weighs in favor of Defendants.

The third *Ferebe* factor is "the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects."  332 F.3d at 737.[21]  Here, "the period of time remaining before trial" totals 52 days between the filing of the Seek Notices on July 18, 2025 and the trial date of September 8, 2025.

---

[21] While the third *Wilk* factor also measures the time remaining before trial, the significant difference—with which this Court does not agree, as discussed in the remedy section below—is that a court is permitted to incorporate continuances into its consideration of the time remaining before trial.  *Wilk*, 452 F.3d at 1222-23 ("§ 3593(a) states that the Death Notice must be filed 'a reasonable time before the trial,' not a reasonable time before the date the trial was scheduled to begin when the Death Notice was formally filed. . . . there is nothing in § 3593 that restricts courts to counting only the days between the Death Notice and a scheduled trial date at the time of the filing of the Death Notice.").

This Court is aware of no cases—and the Government presents none—wherein a court has found that 52 days is a sufficient number of days prior to trial to constitute a reasonable period of time for a Death Notice.  Despite the Government's assertion that 52 days is an "[e]minently reasonable" period of time within which to prepare a capital defense, the Court has no hesitation in concluding that 52 days is wholly unreasonable, for the various reasons discussed herein, including the complexity of capital cases, the need for the special expertise of learned counsel, the expanded discovery and investigation needed to encompass aggravating and mitigating factors, and the time-intensive nature of the penalty phase preparation.

Indeed, 52 days is within the number of days routinely rejected by courts as patently unreasonable.  *See Spurlock*, 782 F.Supp.3d at 1020 (holding that 54 days is "grossly insufficient" and noting that "the government fails to cite to any case suggesting [] 54 days [with its proposed continuance] would be sufficient notice, especially where there are complex charges"); *Le II*, 316 F.Supp.2d at 353 ("It is simply not reasonable to conclude that 94 days is sufficient."); *Constanza-Galdomez*, 2025 WL 1712436 at *8 ("Here, 109 days is patently insufficient to develop a capital defense from scratch."); *United States v. Ferebe*, 2005 WL 1429261 at *1 (D. Md. June 16, 2005) ("Thirty-nine days was ample time for the parties to have completed preparations for a routine felony trial. Thirty-nine days was, however, insufficient time for Ferebe's counsel to have prepared a death defense.").  Thus, the Court finds that the third *Ferebe* factor weighs in favor of Defendants.

The fourth *Ferebe* factor is "the status of discovery in the proceedings."  332 F.3d at 737.[22] The Government states that "[d]iscovery is largely complete in this matter" and that "in light of"

---

[22] The Court observes that the corresponding *Wilk* factor, the third *Wilk* factor, contains similar phrasing.  *Compare Ferebe*, 332 F.3d at 737 ("[T]he status of discovery in the proceedings[.]"), *with Wilk*, 452 F.3d at 1221 ("[T]he status of discovery and motions in the proceedings[.]").

the Seek Notices, it intends to "provide copies of the prior judgments of conviction in discovery and records showing that Defendant Cole was on pretrial release at the time of this murder."  (Dkt. No. 180 at 7-8).  Defendants note, however, that if this case were to proceed as a capital matter, the Government would be obligated to provide "additional discovery concerning the aggravating factors," and further, that "significant discovery [would be needed] to properly defend this case at the mitigation stage."  (Dkt. No. 186 at 43).

Discovery related to aggravating factors and mitigating factors significantly expands the scope of Rule 16 discovery.  *United States. v. Wilson*, 518 F. Supp. 3d 678, 686 (W.D.N.Y. 2021) ("In the context of a potential capital case, it has been recognized that materiality within the meaning of Rule 16 includes evidence relevant to a statutory mitigating factor."); *see also Tsarnaev*, 2013 WL 6196279 at *4 ("[I]n the context of a death-eligible case, discovery under Rule 16(a)(1)(e)(i) includes information material to defense preparation for the penalty phase[.]"); *United States v. Feliciano*, 998 F.Supp. 166, 170 (D. Conn. 1998) ("In order to be entitled to [*Brady*] discovery . . . 'defendants need only establish a substantial basis for claiming that a mitigating factor will apply at the penalty phase, in order to invoke the Government's obligation under *Brady* . . . to produce any evidence which is material to that mitigating factor.'").  As Defendants correctly note, other courts have found the fourth *Ferebe* factor to weigh in favor of the defendant where "[n]o sentencing phase discovery has been produced, nor have the Defendants had reasonable time to conduct their own discovery on mitigation and on defenses to the aggravating factors alleged by the government."  *Constanza-Galdomez*, 2025 WL 1712436 at *9.  Such additional discovery would also undoubtedly generate additional motions practice.  *See also Spurlock*, 782 F.Supp.3d at 1021 (finding this factor weighs in favor of defendants when—even if

"practically all discovery" has been produced—the trial date leaves "insufficient time to address any capital-trial related pretrial motions").

In short, the Court does not credit the Government's position that the only additional discovery merited "in light of" the Seek Notices would be "copies of the prior judgments of conviction" and "records" relating to pretrial release. (Dkt. No. 180 at 7-8). The intricacies of aggravating and mitigating factors certainly requires a much more probing and penetrating investigation and analysis than the Government's cursory wave of the hand suggests. *See Zant*, 462 U.S. at 877 ("[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."). Thus, the Court finds that the additional discovery required by the specific aggravating factors that the Government seeks to use as a basis for justifying the imposition of the death penalty weighs in favor of finding that the Seek Notices were not filed a reasonable period of time before trial—that is, in favor of Defendants.

In sum, the four enumerated *Ferebe* factors favor Defendants. In addition, *Ferebe* permits the consideration of "other factors that may appear relevant." 332 F.3d at 737 ("[C]onsideration of still other factors is not foreclosed."). The Court finds it relevant to include analysis of the first *Wilk* factor—that is "what transpired in the case before the Formal Death Notice was filed." 452 F.3d at 1221.[23]

---

[23] *Wilk* is a six-factor analysis. As noted above in footnotes, three of the *Wilk* factors are substantially similar to the four *Ferebe* factors. The Court does not find it relevant here to analyze the sixth and final *Wilk* factor—that is, the "anticipated nature of the defense, if known," 452 F.3d at 1221—because neither party addresses this factor in their briefing. Accordingly, as in *Spurlock*, this Court will "not speculate" about the nature of Defendants' defenses. 782 F.Supp.3d at 1021. Because even under *Wilk*, five of the six relevant factors favor Defendants, the Court concludes that the Government's Seek Notices were not filed "a reasonable time before trial" under *Wilk*, the same as the Court concludes under *Ferebe*.

The Government argues that Defendants were "prepared to proceed with a capital matter prior to the filing of the [Seek Notices]" because Defendants were informed of the Government's reconsideration of its No-Seek Notice on March 26, 2025 and learned counsel were reappointed since April 2025. (Dkt. No. 180 at 8). Defendants maintain that they have been "consistently prepared to proceed with a non-capital trial," in accordance with the No-Seek Notice. (Dkt. No. 186 at 43-44). Defendants thus argue that the fact of the No-Seeks is a "factor that strongly favors" Defendants because the Government's "eleventh-hour maneuver has upended all expectations and reasonable reliance by Defendant[]s and their counsel," and has "exponentially increased the complexity of this litigation . . . to the detriment of Defendants." *Id*. at 45. The Court agrees with Defendants.

The previously filed No-Seek Notice in this case means that Defendants were not proceeding as if they were defending against a possible death penalty for approximately fourteen months of the approximately nineteen and one-half-month duration of this case. As discussed earlier, Defendants note that if they had known that this case would proceed as a capital case, they would have "litigated their respective cases at the pretrial stages differently" and "made different pretrial decisions as to certain litigation considerations, including continuances, discovery, and plea negotiations." *Id.* at 52. Despite the Government's seemingly doubtful assertion that the Seek Notices "do not require the defendant[s] to substantially alter their multi-year preparations for trial" (Dkt. No. 180 at 8), the fact remains that whether and how Defendants may choose to alter their litigation strategy in the face of the Government's intent to seek the death penalty is not the Government's call to make.

Further, as previously noted, capital defendants are entitled to two counsel to assist in their defense, at least one of whom "shall be learned in the law applicable to capital cases." 18 U.S.C.

§ 3005.  The Court is required to appoint such counsel "promptly," which is generally interpreted to mean "upon an indictment charging a capital crime." *Dangleben*, 2025 WL 1423842 at *5 (collecting cases); 18 U.S.C. § 3005.  The purpose of appointing two counsel, of whom one is learned counsel, is to enable the defendant to "make his full defense by counsel." *Id.*  Thus, Defendants have been significantly hampered because "after the government declared that it would not seek the death penalty, the [defendants] were no longer capital defendants" and no longer entitled to learned counsel. *Casseus*, 282 F.3d at 256.  Accordingly, the learned counsel for the one defendant for whom learned counsel already had been appointed was terminated.  If Defendants are to face a potential sentence of death, the significant period of time during which Defendants proceeded without learned counsel means that Defendants have been unable to make a "full defense by counsel."  Thus, the series of events that transpired prior to the filing of the Seek Notices undoubtedly worked to the disadvantage of Defendants and speak loudly to the significant prejudice that Defendants suffered. *See United States v. Colon-Miranda* ("*Colon-Miranda I*"), 985 F.Supp. 31, 35 (D.P.R. 1997) ("We find that the government did not file its notice of intent to seek the death penalty within a reasonable time before trial given the prejudice that defendants would suffer as a result of the government's vacillation.").  In view of the foregoing, the Court finds that this additional factor—"what transpired in the case before the formal Death Notice was filed," *Wilk*, 452 F.3d at 1221—weighs in favor of Defendants.

Considering the totality of the circumstances, it is abundantly clear to the Court that the Government did not file its Seek Notices a reasonable time before trial.  Accordingly, the Court finds that the Government has violated the FDPA.

### 2.  Remedy

The Government argues that if the timing of the Seek Notices are found to be unreasonable, the Court should follow *Wilk* by granting a continuance of the trial to remedy any perceived

45

problem. (Dkt. No. 180 at 5). The Court declines to follow *Wilk*'s seeming allowance of continuances as a remedy to cure untimely death notices. *Wilk*, 452 F.3d at 1223 ("[E]ven if the district court continued the trial . . . wholly or in part to remedy a Death Notice that would otherwise be untimely without a continuance or to remove any issue about its timeliness, the district court acted properly.").[24]

As previously stated, *Ferebe*'s holding—which the Court adopts—is rooted in an understanding that Section 3593(a) created a *prophylactic* right for a capital defendant to reasonable notice before trial that cannot be violated—rather than a *remedial* right that can be cured by a continuance. *See* 332 F.3d at 727 ("The right requires, *as a prophylactic,* reasonable notice *before trial.* And its indisputable purpose is to ensure that the accused will not be required to stand trial for his life without having received adequate notice before that trial that he *is* to stand trial for [a] capital offense (in addition to ensuring that an accused will not receive the death penalty without having received such notice)." (emphasis in original)). With this understanding of the protections afforded by Section 3593, this Court agrees that "if a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is per se unreasonable." *Ponder*, 347 F.Supp.2d at 267; *see also Le I*, 311 F.Supp.2d at 532 ("Put another way, an untimely Death Notice cannot be rescued by delaying the trial date."); *Hatten*, 276 F.Supp.2d at 579 n.4 ("[D]elaying the trial date is not a remedy for an untimely Death Notice."); *Breeden*, 2003 WL 22019060 at *2 ("[A] court cannot continue a case for the purpose of allowing the government to

---

[24] *Wilk* emphasized the propriety of a continuance to afford the defendant an appropriate time to prepare. *See* 452 F.3d at 1224 (holding that a district court may continue a trial date "after a Death Notice is filed in order to make sure defense counsel has adequate preparation time for a now-required death defense" even if "in the process it cures what might have otherwise been an untimely Death Notice").

46

file a timely Death Notice.").  This statutory right to reasonable notice would be flimsy protection indeed, for would-be capital defendants, if it could be remedied by simply continuing the trial.

The FDPA's procedural protections for capital defendants is clear: that is, "[a] defendant is *legally entitled* not to stand trial for his life unless the government files [a Seek N]otice 'a reasonable time before the trial.'"  *Slone*, 969 F.Supp.2d at 838.  To hold otherwise is to bypass the will of Congress, and abdicate the responsibility of the judiciary to ensure the adjudication of cases before it in a manner that protects the rights of citizens.  *See Colon-Miranda I*, 985 F. Supp. at 35 ("Moreover, the government had plenty of time before this latest request to give notice of its revived intent to seek the death penalty. To grant the government's request here would be tantamount to providing it a continuance, directly employing the court as an arm of the prosecution.").  In sum, the Court finds that the only appropriate remedy for a Seek Notice that is not filed a "reasonable time before trial" is to strike the Government's Seek Notice.

This case presents several independent bases upon which the Court relies to strike the Seek Notices.  First, Section 3593(a) bluntly forecloses the filing of an Amended Seek Notice without good cause.  18 U.S.C.§ 3593(a)(2) ("The court may permit the attorney for the government to amend the notice upon a showing of good cause."); *see also Le II*, 316 F.Supp.2d at 351 ("[T]he Amended Death Notice must be stricken because the government has not shown good cause[.]").  Second, a continuance would blindly ignore the Court's authority to set and enforce its deadlines. *See Rosado-Rosario*, 1998 WL 28273 at *3 (stating, in the face of the Government's filing of a late Seek Notice, that "[n]oncompliance with local rules, as well as noncompliance with court orders [regarding Section 3593 Notice deadlines], will . . . not be tolerated").  The Government, as a litigant, is not somehow uniquely entitled to a safety net when it fails to abide by Court orders, especially in a context that governs life and death.  Third, continuing a trial date to remedy an

improper Seek Notice—either in non-compliance with the Court's deadline, or Section 3593(a)'s timeliness requirement—would permit the Government to change its mind on a fundamental issue in a criminal case up to the eve of trial and unilaterally wreak chaos on the proceedings at will. *See Colon-Miranda II*, 985 F.Supp. at 39 ("We simply cannot postpone this trial for several months to allow defense counsel to prepare for a capital case when this case has been scheduled for months and the government did not bother to announce its actual intention to seek the death penalty until the eleventh hour."); *see also Spurlock*, 782 F.Supp.3d at 1013 ("[T]he government decided—certainly not by inadvertence or accident—to reverse course on an issue of critical importance, involving the [defendant's] life . . . with full knowledge that the reversal would have a chaotic impact on the progression of this case.").  And finally, in addition to these multiple bases upon which to rely in categorically striking the Government's Seek Notices, granting a continuance would be a completely inappropriate remedy where the Government has filed Seek Notices 491 days past the Court's deadline and only 52 days before trial, based on a mere change in policy.

## IV.   CONCLUSION

The government cannot be allowed to play "fast and loose" with decisions involving life and death.  *Spurlock*, 782 F.Supp.3d at 1013; *Constanza-Galdomez*, 2025 WL 1712436 at *13. The lesson here is clear: "[i]f the death penalty is to be sought, the sooner everyone knows, the better. That is the policy underlying § 3593 and the impetus for the Court's decision to hold the Government's feet to the fire."  *Ponder*, 347 F.Supp.2d at 271.

Courts have always recognized that death is different: death is final; death is irrevocable; death is the ultimate punishment.  *See, e.g.*, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from

one of only a year or two."); *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) ("There is no question that death as a punishment is unique in its severity and irrevocability."); *Monge v. California*, 524 U.S. 721, 731-32 (1998) ("The penalty phase of a capital trial is undertaken to assess the gravity of a particular offense and to determine whether it  warrants the ultimate punishment[.]").  Courts have held the Government to the highest of standards when it seeks to terminate the life of a human being as a consequence for a crime that the individual has committed.  *See Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Because the death penalty is the most severe punishment . . . [c]apital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'"); *see also Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) ("[W]e have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding[.]").  That is why the Supreme Court has mandated that "in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner."  *Somerville*, 410 U.S. at 461 (quoting *Perez*, 9 Wheat. at 580).  This Court will heed that caution here.

For all of the foregoing reasons, it is impossible to provide Defendants Enock Cole and Jiovoni Smith with a capital trial that upholds their statutory rights and respects this Court's authority to manage the proceedings.[25]  Accordingly, the Court will grant Defendants' Motion to Strike, and the trial scheduled to commence on September 8, 2025 will proceed as a non-capital trial.

---

[25] Defendants present a number of other issues in their briefing, including constitutional issues that this Court need not reach in light of its ruling herein.  *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other grounds upon which the case may be disposed of.").

<u>**ORDER**</u>

**UPON CONSIDERATION** of the foregoing, it is hereby

**ORDERED** that Defendants Enock Cole and Jiovoni Smith's Motion to Strike (Dkt. No. 186) is **GRANTED**; and it is further

**ORDERED** that the Government's "Notice of Intent to Seek the Death Penalty" for Defendant Enock Cole (Dkt. No. 175) is **STRICKEN**; and it is further

**ORDERED** that the Government's "Notice of Intent to Seek the Death Penalty" for Defendant Jiovoni Smith (Dkt. No. 176) is **STRICKEN**; and it is further

**ORDERED** that the trial in this matter scheduled for **September 8, 2025** will proceed as a non-capital trial.

**SO ORDERED.**

Dated: September 7, 2025                    _____/s/_____
                                           WILMA A. LEWIS
                                           Senior District Judge

50